UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ABIGAIL RATCHFORD, et al.,<br><br>       Plaintiffs,<br>           v.<br><br>ORANGE LANTERN, INC. and MARK PESSOLANO,<br><br>       Defendants. | Civil Action No. 19-30092-MGM |

MEMORANDUM AND ORDER ON CROSS MOTIONS FOR
SUMMARY JUDGMENT AND DEFENDANTS' MOTIONS TO STRIKE
(Dkt. Nos. 59, 60, 61, & 62)

March 13, 2024

MASTROIANNI, U.S.D.J.

## I.    INTRODUCTION

This is one of numerous similar cases that have been brought in this district and around the country by the same attorneys on behalf of groups of professional models and social media influencers who allege their images have been improperly used to promote night clubs offering adult entertainment. Although most of these cases have been resolved without a court ruling on the substantive claims, the parties in this case have proceeded through discovery and have now filed dispositive motions. The plaintiffs, Rosa Acosta, Jessica Burciaga, Amanda Cerny, Shelby Chesnes, Iesha Marie Crespo, Jaime Edmondson-Longoria, Jamillette Gaxiola, Brenda Geiger, Emma Glover, Tiffany Toth Gray, Hillary Hepner, Jessica Hinton, Krystal Forscutt Hipwell, Ashley Hobbs, Melanie Iglesias, Rosie Jones, Julianne Klaren, Joanna Krupa, Arianny Celeste Lopez, Jaime

Middleton, Denise Milani, Andra Cheri Moreland, Lyna Perez, Lucy Pinder, Lina Posada, Abigail Ratchford, Danielle Ruiz, Ina Schnitzer, Sarah Stage, Jacklyn Swedberg, and Chantel Zales (collectively "Plaintiffs"),[1] have brought this action against Orange Lantern, Inc. and Mark Pessolano (collectively "Defendants"). Orange Lantern previously operated the Magic Lantern night club and Pessolano was one Orange Lantern's owners. Plaintiffs have alleged Defendants are liable for images of Plaintiffs that were posted, without their consent or knowledge, to Magic Lantern's Facebook page between July 16, 2012 and November 21, 2018.

In their Amended Complaint, Plaintiffs asserted twelve causes of action arising from the social media postings: two federal claims alleging false advertising, in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (Count I), and false association, in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (Count II), and ten claims under Massachusetts law. Plaintiffs have since withdrawn three of their state law claims, leaving claims for right of privacy based upon Mass. Gen. Laws c. 214, § 1B (Count IV); unauthorized use of a person's name, portrait, or picture in violation of Mass. Gen. Laws c. 214, § 3A (Count V); unfair trade practices, in violation of Mass. Gen. Laws c. 93A, § 11 (Count VII); defamation (Count VIII); negligence and respondeat superior (Count IX); unjust enrichment (Count XI); and quantum meruit (Count XII). (Am. Compl., Dkt. No. 28; Pls. Mot. Summ. J. n. 4, Dkt. No. 62 ("Plaintiffs hereby withdraw their third and sixth causes of action . . . and their tenth cause of action.").) Both parties have moved for summary judgement, each side arguing that there are no disputes of material fact and they are entitled to judgment as a matter of law. (Dkt. Nos. 59 & 62.) Defendants have also filed motions asking the court to exclude testimony and evidence offered by two experts retained by Plaintiffs. (Dkt. Nos. 60 & 61.)

---

[1] Two other women were also named as plaintiffs in the Amended Complaint, but the parties stipulated to the dismissal of the claims by Sarah Underwood and agree that the claims of Tara Leigh Patrick a/k/a Carmen Electra have also been resolved. (Sarah Underwood Stip. Dismissal, Dkt. No. 50; Pls.' Mot. Summ. J., n.2, Dkt. No. 62.)

For the reasons that follow, Defendants' motions to exclude Plaintiffs' experts are denied; Plaintiffs' motion for summary judgment is denied; and Defendants' motion for summary judgment is allowed as to all counts except the defamation claims (Count VIII). Further, since the defamation claims are based, in part, on images posted to the Magic Lantern's social media pages more than three years before this action was filed, the case is stayed pending a decision from the Massachusetts Supreme Judicial Court ("SJC") on the question certified to it *Davalos v. Baywatch Inc.,* _ F. Supp. 3d _, Civ. Action No. 21-11075-NMG, 2023 WL 8703557 (D. Mass. Dec. 15, 2023).

## II.   SUMMARY JUDGMENT STANDARD

"The function of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Burt v. Bd. of Trs. of Univ. of R.I.,* 84 F.4th 42, 59 (1st Cir. 2023) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990)). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bellone v. Southwick-Tolland Reg'l Sch. Dist.,* 748 F.3d 418, 422 (1st Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law,'" and disputes are genuine when a reasonable jury considering the evidence "'could resolve the point in the favor of the non-moving party.'" *Cherkaoui v. City of Quincy,* 877 F.3d 14, 23-24 (1st Cir. 2017) (quoting *Sánchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir. 1996)).

In most cases, the court "may consider only evidence that would be admissible at trial." *Klauber v. VMware, Inc.,* 80 F.4th 1, 7 (1st Cir. 2023). In the District of Massachusetts, the presentation of such evidence is governed by Local Rule 56.1, which provides that "[m]otions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions

and other documentation." D. Mass. R. 56.1. While parties typically file a separate document, a statement of material facts contained within a party's supporting memorandum satisfies the requirements of the local rule provided the facts are supported with citations to documents in the record. A party opposing a motion for summary judgment has a corresponding obligation to provide the court with a concise statement of material facts that are in dispute, also tied by page references to specific "affidavits, depositions and other documentation." *Id.*

Usually, the opposing party files a paragraph-by-paragraph rebuttal to the moving party's 56.1 statement of material facts and may also include additional facts that support the opposition. Such a format makes it easy for the court to identify the contested facts but is not required under the local rule. *See McGrath v. Tavares*, 757 F.3d 20, 26 n.10 (1st Cir. 2014). Since the local rule permits the moving party to file a reply, but does not grant the opposing party an opportunity to file a sur-reply, a moving party's reply may not assert new facts or raise new arguments beyond what is necessary to respond to the opposing party's opposition. *See Knowlton v. Shaw*, 791 F. Supp. 2d 220, 268 (D. Me. 2011) (explaining that when a local rule provides for the filing of a reply but not a sur-reply, the inclusion of new facts in a reply "run[s] contrary to the requirement that the facts must be interpreted in a manner most congenial to the non-movant"). Properly supported facts set forth by the moving party and not placed into dispute by record evidence cited by the opposing party are deemed admitted for purposes of the summary judgment motion. D. Mass. R. 56.1; *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . .").

Undisputed facts must be viewed "in the light most favorable to the non-moving party" and the court must "draw all reasonable inferences in [the non-moving party's] favor." *Carlson v. Univ. of New England*, 899 F.3d 36, 43 (1st Cir. 2018). "The fact that the parties have filed cross motions . . .

does not alter these general standards." *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023). Each party's motion is reviewed "independently, viewing the facts and drawing inferences as required by the applicable standard." *Id.*

### III.   DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFFS' EXPERTS

Defendants have moved to exclude evidence related to the opinions of two expert witnesses retained and disclosed by Plaintiffs. Stephen Chamberlin, an agent with more than thirty years of experience in the model and talent industry, has offered opinions about the amount of money each plaintiff would have charged for permitting her image to be posted on Magic Lantern's Facebook page. Thomas Maronick, an emeritus professor of marketing with more than thirty years of experience in his field, conducted a survey and has offered opinions about the consumer confusion created by the Facebook postings.

"A district court must 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Packgen v. Berry Plastics Corp.*, 847 F.3d 80, 85 (1st Cir. 2017) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). At the same time, under First Circuit precedent, exclusion of an expert report at summary judgment is only warranted when the report's "defects are obvious on the face of [the] proffer." *Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997). The admission of expert evidence is governed by Fed. R. Evid. 702, which has recently "been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702, Adv. Comm. Notes 2023 Amendment. In order for an expert's opinions to be admissible, the court must find:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert's opinion reflects a reliable application of the principles and methods
to the facts of the case.

Fed. R. Evid. 702.

Notably, these requirements focus on whether there is a sufficient analytical connection between the data the expert relies upon and the opinions offered. *See United States v. Jackson*, 58 F.4th 541, 550-51 (1st Cir. 2023). Questions regarding the strength of the facts underlying an expert's opinion, like all questions concerning weight and credibility of evidence, must be resolved by a factfinder. *Id.* Plaintiffs contend that the opinions offered by Chamberlin and Maronick meet the admissibility requirements of Rule 702 and Defendants' arguments, while framed as objections to methodology, actually concern questions of weight and credibility that cannot be resolved at summary judgment.

After reviewing Chamberlin's report and the parties' arguments, the court finds his professional background qualifies him to provide testimony about the rates Plaintiffs would have charged to appear on Magic Lantern's Facebook page. To the extent such facts are relevant, his opinions are sufficiently reliable to be admissible pursuant to Rule 702. There is no dispute that Chamberlin has over thirty years of experience as an agent for professional models and has negotiated numerous contracts for models to appear in advertising. Since Plaintiffs did not agree to license their images to any strip clubs during the relevant period, Defendant's observation that Chamberlin lacks professional experience negotiating contracts with strip clubs is immaterial. *See Microfinancial, Inc. v. Premier Holidays Intern., Inc.*, 385 F.3d 72, 80 (1st Cir. 2004) (explaining that an expert qualified by knowledge or experience "need not have had first-hand dealings with the precise type of event that is at issue" in a case).

In his report, Chamberlin acknowledged that his opinions are not based on applying an objective formula, but that does not mean the methods he used to arrive at his opinions were

unreliable. He explained that modeling contracts are negotiated based on an individualized balancing of multiple criteria and that is not disputed by Defendants. Chamberlin has listed the criteria he uses in his profession and explained various assumptions he makes when negotiating rates for individual models to appear in specific advertising. He also reviewed the posted images, spoke with each of the plaintiffs, and reviewed her work history before reaching his opinions. Any objections to the accuracy of Chamberlin's statements about the criteria he considers when negotiating modeling rates or the sufficiency of the facts reviewed before rendering his opinion may be presented to the trier of fact, but they do not warrant his disqualification at this stage of the litigation.

Similarly, Defendants' critiques of the consumer survey designed and conducted by Thomas Maronick do not raise the types of concerns that warrant the court excluding his opinions pursuant to Rule 702. Maronick has a doctorate degree in marketing, decades of teaching at the graduate and undergraduate level, and extensive experience conducting marketing research, all of which suffice to establish that he is qualified to design and conduct consumer surveys and interpret the results. He was retained by Plaintiffs to design an online survey that could be administered to "a sample of consumers in the target market for gentlemen's clubs in Massachusetts" and used to determine the perceptions of consumers as to women shown in social media postings by the Magic Lantern, specifically, "whether the women . . . have any affiliation with the club, approved the use of their images, were paid for use of their images by the Magic Lantern Club, and . . . participate in some or any of the events or activities at the Magic Lantern Club." (Maronick Rep., Dkt. No. 62-5, 3.) The survey he designed and the way it was administered gathered data that was consistent with the limited scope of that inquiry. The reliability of his methods is not undermined by the fact that another qualified expert may have made different decisions about how to gather similar consumer

information. *Packgen*, 847 F.3d at 87 (explaining that "[t]he existence of other methods of gathering facts does not mean that the facts [an expert] relied on were insufficient").

Maronick's opinions were also within the scope of that inquiry and well-supported by the survey data. Specifically, he determined that (1) a large majority of consumers considering whether to visit a gentleman's club consider the women working there to be an important factor in their decision; (2) such consumers are likely to believe that women shown in ads posted by the Magic Lantern have (a) agreed to endorse or sponsor the Magic Lantern, (b) a connection with the Magic Lantern, (c) approved the use of their images, (d) been paid to promote the Magic Lantern, and (e) participated in activities at the Magic Lantern; and (3) such consumers are likely to believe the Magic Lantern posted images of women in order to convey to potential consumers that they would see similar looking women if they visited the Magic Lantern. At a trial, Defendants would, of course, be free to object should Maronick offer opinions that go beyond the survey data or to argue that the survey data was flawed and should be assigned little or no weight.  However, in the absence of concerns about Maronick's professional qualifications and the analytical fit between the survey data and the opinions he offered in his report, the court finds no basis to exclude him as an expert under Rule 702.

## IV.   MATERIAL FACTS

Both Plaintiffs and Defendants have taken the position that the material facts are not in dispute, though they disagree about what facts are material and ask the court to draw different legal conclusions from the facts. Plaintiffs supported their motion for summary judgment with a separate statement of material facts. (Dkt. No. 63.) Defendants initially included a statement of material facts within their supporting memorandum. (Dkt. No. 59.) After Plaintiffs objected to that approach, Defendants filed a separate document containing a version of its original statement of

material facts reformatted so that each sentence became a separately numbered paragraph. (Dkt. No. 77.) Neither side filed a paragraph-by-paragraph objection to the other's statement of material facts. Plaintiffs referenced their own statement of facts in their opposition to Defendants' motion. (Dkt. No. 72, n.1.) Defendants included additional facts that they relied upon in their reply to Plaintiffs' opposition to their motion for summary judgment and their opposition to Plaintiffs' motion for summary judgment. The court has not considered these additional facts because Defendants' filing was untimely, having been filed two weeks after Defendants' opposition to Plaintiffs' motion, the same day Plaintiffs' reply was filed. As explained above, a moving party is not permitted to supplement a statement of material facts in a reply. For these reasons, the following facts are taken only from the statements of material facts filed to support each motion for summary judgment and conflicting facts are noted.

Between 2010 and 2019, defendant Orange Lantern, Inc. owned and operated Magic Lantern, a venue located Palmer, Massachusetts that employed women to entertain its customers while nude or semi-nude. Defendant Mark Pessolano was one of Orange Lantern, Inc.'s three shareholders and took an active role in the operation of Magic Lantern. In 2010 or 2012, Orange Lantern, Inc. hired Greg Couto as a third-party contractor to manage social media accounts for Magic Lantern. Coutu controlled Magic Lantern's Facebook account until 2019 and posted content to engage potential customers and build up the Magic Lantern brand. During the years Couto managed Magic Lantern's social media accounts, he had authority to publish content directly onto Magic Lantern's social media accounts. Pessolano did not request or direct Couto to post any of the images at issue in this action, but he was aware Couto was posting high-quality images of women with no connection to Magic Lantern on the Facebook page. Though Pessolano had experience obtaining consent before using a dancer's image in advertising, he never asked whether Couto had permission to use the images he was posting. After this lawsuit was filed in the summer of 2019,

9

Pessolano contacted Couto and instructed him to remove postings containing Plaintiffs' images. Orange Lantern, Inc. sold all its assets to another entity on November 19, 2019.

At least one image of each of the Plaintiffs was posted to Magic Lantern's Facebook page between July 16, 2012 and November 11, 2018. Though some of the posts included text referencing Magic Lantern, none of the posts expressly stated that an association existed between the pictured individual and Magic Lantern. Many images were posted with more generic text or without any accompanying text. Of the group surveyed by Maronick, approximately 79% of respondents believed some or all of the women in the images they were shown had some affiliation with Magic Lantern and around 70% believed some or all of the women had (1) agreed to sponsor or endorse Magic Lantern, (2) had approved the use of their image by Magic Lantern, and (3) had participated in activities at Magic Lantern. (Maronick Rep., Dkt. No. 62-5, 14-15.)

Plaintiffs are all domiciled outside of Massachusetts and none of them ever had a business relationship with Magic Lantern. The images posted on Magic Lantern's Facebook page had previously appeared on Plaintiffs' own social media accounts or websites or in advertising campaigns for other businesses. Plaintiffs were not aware their images had been posted on Magic Lantern's Facebook page until shortly before their complaint was filed and they did not consent to the use of their images. At the times their images were posted on Magic Lantern's Facebook page, Plaintiffs would not have agreed to license their images for use by Magic Lantern. They believed their professional reputations could suffer if it seemed that they were employed by, appeared at, endorsed, or were otherwise affiliated with venues offering nude or semi-nude entertainment. However, no Plaintiff identified any specific event or circumstance suggesting the postings had any impact on their careers.

## V.   DISCUSSION

A. Claims Against Mark Pessolano

In addition to bringing their claims against Orange Lantern, Inc., the corporation that owned and operated Magic Lantern, Plaintiffs have asserted claims against Pessolano, in his personal capacity. Under Massachusetts law, "[a] corporate officer is personally liable for a tort committed by the corporation that employs him, if he personally participated in the tort by, for example, directing, controlling, approving, or ratifying the act that injured the aggrieved party." *Townsends, Inc. v. Beaupre*, 716 N.E.2d 160, 164 (Mass. App. Ct. 1999); *see also Addis v. Steele*, 648 N.E.2d 773, 777 (Mass. App. Ct. 1995) (ruling that owners and managers of inn were not liable for damages from fire in the absence of evidence that they personally "participated in acts causing injury to the plaintiffs"). Typically, there must be evidence that a corporate officer personally participated in the acts that injured the plaintiffs. *Addis*, 38 Mass. App. Ct. at 776-77; *see also Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 907 (1st Cir. 1980) (explaining courts "have found personal liability" where a corporate officer was directly involved as a "guiding spirit" or "central figure" in the injury-causing conduct).

Defendants seek dismissal of the individual capacity claims against Pessolano, arguing there is no evidence from which a reasonable jury could conclude that he personally participated in posting any of the images giving rise to Plaintiffs' claims in this case. There is no evidence suggesting Pessolano posted any of the images. Instead, the parties agree the images were all posted by Greg Couto, a third-party Orange Lantern hired to manage social media postings for Magic Lantern. At most, Pessolano made the decision to hire Couto and gave him unfettered access to the Magic Lantern social media accounts, without providing any oversight. A reasonable jury considering those facts could conclude Pessolano acquiesced to the posting of the images, but there is no evidentiary basis for a jury to find he played an active role in selecting images or directing Couto's actions. In the absence of such evidence, the court will grant Defendants' motion to

dismiss the claims asserted against Pessolano in his individual capacity. *Townsends*, 716 N.E.2d at 165-66 (affirming judgment in favor of individual corporate president and sole shareholder following trial in which no evidence was presented establishing that he was personally responsible for misrepresentations on corporation's financial statements).

B. Claims Against Orange Lantern

Plaintiffs claim Orange Lantern violated the Lanham Act, engaged in unfair or deceptive business practices, committed several torts, and was unjustly enriched when Couto, acting as its agent, posted images of Plaintiffs on the Magic Lantern Facebook page. In their motion, they assert the undisputed factual record entitles them to summary judgment on each of their claims. Defendants contend Orange Lantern is entitled to summary judgment on all of Plaintiffs' claims because the undisputed facts are insufficient to enable Plaintiffs to prevail on any claim. Additionally, Defendants argue that even if the court declines to grant summary judgment on substantive grounds or grants summary judgment to Plaintiffs as to some or all claims, state law statutes of limitations entitle them to summary judgment as to claims based on images posted more than three years (tort and equitable claims) or four years (Lanham Act and unfair or deceptive trade practices) before the original complaint was filed on  July 1, 2019.


1. Lanham Act

The Lanham Act protects against the deceptive and misleading use of marks in interstate commerce primarily through its trademark provisions, but it also "creates a cause of action for unfair competition through misleading advertising or labeling." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014); 15 U.S.C. § 1125(a). Although the statute "authorizes suit by 'any person who believes that he or she is likely to be damaged' by a defendant's false advertising," in *Lexmark International, Inc. v. Static Control Components, Inc.*, the Supreme Court held that only a more

limited group of plaintiffs may bring suits under § 1125(a). 572 U.S. 118, 129 (2014) (quoting
§ 1125(a)(1)). To invoke the statutory cause of action, a plaintiff must be within the zone of
interests protected by § 1125(a) and have suffered injuries "proximately caused by violations of the
statute." *Id.* at 132.

At the summary judgment stage, it is the plaintiff's burden to identify evidence sufficient to
establish a right to sue under § 1125(a).[2] *See id.* at 140. The Lanham Act "includes an 'unusual, and
extraordinarily helpful,' detailed statement of the statute's purposes" which define the zone of
interests for claims brought under the statute. *Id.* at 131. There are two types of claims available
under § 1125(a): false advertising and false association. *Id.* at 122 (citing *Waits v. Frito-Lay, Inc.*, 978
F.2d 1093, 1108 (9th Cir. 1992), abrogated, in part, by *Lexmark*). False advertising claims enable
plaintiffs to recover when a defendant has made "false representations in advertising concerning
the qualities of goods or services," and false association claims create liability for "false
representations concerning the origin, association, or endorsement of goods or services through the
wrongful use of another's distinctive mark, name, trade dress, or other device." *Waits*, 978 F.2d at
1108.

Plaintiffs have alleged Orange Lantern is liable for both types of claims and the Facebook
postings injured them by (1) falsely implying an association between them and a strip club and (2)
depriving them of the revenue they would have received had Orange Lantern paid to obtain proper
authority to use their images. Because the statutory goal served by § 1125(a) is to protect those

---

[2] Although the Supreme Court applied the zone-of-interests and proximate cause tests only to analyze
standing to bring a false advertising claim, it strongly implied plaintiffs would need to satisfy the same tests
to establish standing to bring false association claims. The Court noted that § 1125(a) creates liability for
both types of claims and began its analysis with broad language in § 1125(a) that applies equally to false
association claims. Additionally, the Court referenced false association claims while defining the zone of
interests for false advertising cases, suggesting a broader zone of interests might be protected because
"[m]ost of the enumerated purposes are relevant to false-association cases," while "a typical false-advertising
case will implicate only [one of] the Act's goal[s]." *Lexmark*, 572 U.S. at 131.

engaged in commerce from unfair competition, Plaintiffs must allege "an injury to a commercial interest in reputation or sales" caused by Orange Lantern's false advertising to "come within the zone of interests in a suit for false advertising under § 1125(a)." *Lexmark*, 572 U.S. at 131-32. The zone of interests protected by false association claims is at least as broad and may even be more extensive because other "enumerated purposes are relevant to false-association cases." *Id.* at 131. Plaintiffs who were earning their living by promoting their image, likeness, or identity when their images were posted to Magic Lantern's Facebook page clearly had a commercial interest in their reputations and sales such that an injury to either would bring them within the zone of interests for both types of claims. Whether Plaintiffs have identified evidence from which a factfinder could conclude they suffered an injury proximately caused by Orange Lantern presents a closer question.

The loss of the income they "would have generated had Defendants operated through legal channels and hired [them] to appear" on Magic Lantern's Facebook page is not the type of injury that can satisfy the proximate-cause requirement. (Pls. Mot. Summ. J., Dkt. No. 62, 11.) As the Supreme Court explained in *Lexmark*, the proximate-cause requirement for a false advertising claim "ordinarily" requires a plaintiff to show "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." *Lexmark*, 572 U.S. at 133; *see also Waits*, 978 F.2d at 1108 (explaining that Congress did not intend the Lanham Act to create a federal tort of misrepresentation). The Supreme Court did not separately define the proximate-cause requirement for false association claims, but the "[t]raditional proximate-causation principles" described in *Lexmark* apply equally well to false association claims. *Lexmark*, 572 U.S. at 138.

At this stage of litigation, neither of the injuries identified by Plaintiffs suffice to establish the required proximate cause. Orange Lantern's decision to use Plaintiffs' images without permission deprived Plaintiffs of the opportunity to be paid for their appearances on Magic Lantern's Facebook page, but that economic injury was completely independent of any

misperceptions of an association between Plaintiffs and Magic Lantern created by the Facebook postings. *See id.* at 138; *see also Souza v. Exotic Island Enterprises, Inc.*, 68 F.4th 99, 120 (2d Cir. 2023) (ruling, in a factually similar case, that a defendant's failure to pay when misappropriating a plaintiff's image "fails to check any of *Lexmark's* boxes"). In theory, the postings could have caused the type of reputational injury that can satisfy the proximate-cause requirement. However, Plaintiffs have stopped short of claiming that they actually suffered such reputational injuries, and their Statement of Material Facts is devoid of evidence that any such injuries occurred. As Defendants have noted, "none of the plaintiffs could provide any evidence of even the slightest actual impact these postings had on their careers" during discovery. (Defs. Mot. Summ. J., Dkt. No. 59, 5.) In the absence of such evidence, the court concludes Plaintiffs have not demonstrated that they would be able to prove they suffered "an injury to a commercial interest in sales or business reputation proximately caused by [Defendants'] misrepresentations." *Lexmark*, 572 U.S. at 140; *see also Souza*, 68 F.4th at 120 (finding no reputational injury proximately caused by the defendant's misuse of the plaintiffs' images because plaintiffs did not present any evidence suggesting there was any impact on their careers). Summary judgment will, therefore, enter for Orange Lantern as to Plaintiffs' Lanham Act claims (Counts I & II).

### 2.  Unfair Trade Practices

Plaintiffs have also asserted the Facebook postings constituted unfair and deceptive trade practices in violation of Mass. Gen. Laws c. 93A, § 11. More specifically, they alleged that Orange Lantern made the Facebook postings as part of a false and misleading advertising campaign and "in order to convince potential consumers . . . that Plaintiffs were either strippers at the Club, endorsed the Club, or were otherwise associated or affiliated with the Club." (Am. Compl., Dkt. 28 ¶ 248.) "Section 11 of Chapter 93A 'bestows a right of action on any person who engages in the conduct

of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the unfair or deceptive act or practice.'" *LimoLiner, Inc. v. Dattco, Inc.*, 919 F.3d 86, 90 (1st Cir. 2019) (quoting *Auto Flat Car Crushers, Inc. v. Hanover Ins. Co.*, 17 N.E.3d 1066, 1076 (Mass. 2014) (internal alteration and quotations omitted)). "A successful Chapter 93A § 11 claim . . . has three elements: (1) the defendant engaged in an unfair method of competition or committed an unfair deceptive act or practice; (2) a loss of money or property was suffered; and (3) the defendant's unfair or deceptive method, act or practice caused the loss suffered." *Anoush Cab, Inc. v. Uber Techs., Inc.*, 8 F.4th 1, 16 (1st Cir. 2021). For the reasons discussed above, Orange Lantern is entitled to summary judgment on Plaintiffs' Chapter 93A claim (Count VII) because there is no evidence in the summary judgment record from which a reasonable jury could find Plaintiffs suffered a "loss of money or property" caused by Orange Lantern's misleading use of Plaintiffs' images. *See Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 56 (1st Cir. 1998) (explaining that, under Chapter 93A, § 11, the plaintiff must demonstrate that it suffered a loss of money or property, not time or intangibles like peace of mind, and that the loss stemmed from conduct that violated Chapter 93A).

### 3.  Tort Claims

#### (a)  Right of Privacy

A plaintiff whose privacy has been invaded by a defendant who made a "public disclosure of private facts . . . [or] intruded unreasonably upon the plaintiff's 'solitude' or 'seclusion'" may seek a remedy pursuant Mass. Gen. Laws c. 214, § 1B. *Polay v. McMahon*, 10 N.E.3d 1122, 1126 (Mass. 2014). Although other types of conduct may give rise to claims for invasion of privacy in some contexts, § 1B does not provide a remedy for false light invasion of privacy or appropriation of a plaintiff's name or likeness. *Ayash v. Dana-Farber Cancer Inst.*, 822 N.E.2d 667, 681 n. 16 (Mass. 2005) (explaining that § 1B provides a remedy for public disclosure of private facts and

unreasonably intrusive conduct, but does not "give rise to [a] claim of false light invasion of privacy"); *Tedeschi-Freij v. Percy Law Group, P.C.*, 172 N.E.3d 774, 776 n. 7 (Mass. App. Ct. 2021) (interpreting Mass. Gen. Laws c. 214, § 3A as providing a remedy for the appropriation of a person's name or likeness for the commercial benefit of another that does not overlap with the remedies provided under § 1B). *But see*, *Shepard's Pharmacy, Inc. v. Stop & Shop Cos., Inc.*, 640 N.E.2d 1112, 1116 (Mass. App. Ct. 1994) (affirming trial judge's finding that the defendant's misappropriation of the plaintiff's name and image in advertising violated § 1B, but reversing separate damages award for lack of supporting evidence). It is clear from the summary judgment record that Orange Lantern's reposting of publicly available images of Plaintiffs did not involve any private information about Plaintiffs or intrude on their solitude or seclusion. Orange Lantern is, therefore, entitled to summary judgment on Plaintiffs' invasion of privacy claims brought pursuant to § 1B (Count IV).

(b)  Unauthorized Use of Individual's Name, Portrait, or Picture

"[T]he interest protected [by Massachusetts General Laws c. 214, § 3A] 'is the interest in not having the commercial value of one's name, portrait or picture appropriated to the benefit of another.'" *Tedeschi-Freij*, 172 N.E.3d at 779 (quoting *Tropeano v. Atlantic Monthly Co.*, 400 N.E.2d 847, 850 (Mass. 1980)). This is a personal interest and only plaintiffs domiciled in Massachusetts may invoke the protection provided by § 3A. *Bi-Rite Enterprises Inc. v. Bruce Miner Co., Inc.*, 757 F.2d 440, 444 (1st Cir. 1985) (stating § 3A did not apply to claims brought by individuals and entities not domiciled in Massachusetts). Since Plaintiffs are all domiciled outside of Massachusetts, summary judgment on Plaintiffs' § 3A claims must enter in favor of Orange Lantern.

(c)  Defamation (Count VIII)

"To withstand a motion for summary judgment on a defamation claim, a plaintiff must have a reasonable expectation of proving four elements: first, the defendant made a statement, of

and 'concerning the plaintiff, to a third party'; second, the 'statement could damage the plaintiff's reputation in the community'; third, the defendant was at fault for making the statement; and fourth, the statement caused economic loss or, in four specific circumstances, is actionable without economic loss." *Scholz v. Delp*, 41 N.E.3d 38, 45 (Mass. 2015). A plaintiff must also be able to establish that the defendant's statement was "one of fact rather than opinion" because "a statement that does not contain 'objectively verifiable facts' is not actionable." *Scholz*, 41 N.E.3d at 45. "[W]hether a communication is reasonably susceptible of a defamatory meaning . . . is a question of law for the court[,]" but if it "is susceptible of both a defamatory and nondefamatory meaning, a question of fact exists for the jury." *Phelan v. May Dept. Stores Co.*, 819 N.E.2d 550, 554 (Mass. 2004) (internal quotations omitted).

"A communication is susceptible to defamatory meaning if it would tend to injure the plaintiff's reputation, or hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community." *Damon v. Moore*, 520 F.3d 98, 103 (1st Cir. 2008) (internal quotations omitted). If the allegedly defamatory statement "may prejudice the plaintiff's profession or business," the plaintiff is not required to prove economic loss and "may recover noneconomic losses, including emotional injury and damage to reputation." *Ravnikar v. Bogojavlensky*, 782 N.E.2d 508, 511 (Mass. 2003). Additionally, "[a]n undamaged plaintiff may recover nominal damages." *Id.*

Plaintiffs assert the Facebook postings were defamatory because they falsely implied that Plaintiffs had agreed to be associated with Magic Lantern and that they need not establish an economic loss because such an association disparaged them in their profession. As a matter of law, the court agrees that the postings were "reasonably susceptible of a defamatory meaning." The presence (or absence) of an affiliation between Plaintiffs and Magic Lantern is a fact that can be objectively verified, and a false statement of an affiliation between a model and a strip club may

injure the model's reputation with a significant segment of the community. *See Morrell v. Forbes, Inc.*, 603 F. Supp. 1305, 1307 (D. Mass. 1985) (finding a photograph of an individual was susceptible of a defamatory meaning when context suggested the individual might have a connection with organized crime). However, the court also finds the postings were equally susceptible of other interpretations that did not imply any verifiable fact, much less a defamatory one. Since there is a factual question regarding the meaning of the Facebook postings, the court denies both parties' motions for summary judgment as to Plaintiffs' defamation claims (Count VIII).

(d)  Negligence (Count IX)

"To prevail on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage." *Williams v. Steward Health Care System, LLC*, 103 N.E.3d 1192, 1196 (Mass. 2018) (internal quotations omitted). "[T]he existence of a duty is a question of law, and is thus an appropriate subject of summary judgment." *Jupin v. Kask*, 849 N.E.2d 829, 835 (Mass. 2006). Though Plaintiffs contend that they are entitled to summary judgment on their negligence claims, they have not identified any duty of care owed to Plaintiffs by Orange Lantern, or Couto, let alone one breached by the Facebook postings. Orange Lantern is, therefore, entitled to summary judgment on Plaintiffs' negligence claims.

(e)  Unjust Enrichment (Count XI) and Quantum Meruit (Count XII)

Though Plaintiffs have separately asserted claims for unjust enrichment and quantum meruit, the court treats these two claims together because, under Massachusetts law, these quasi-contract claims "are treated similarly and have the same elements." *SAR Grp. Ltd. v. E.A. Dion, Inc.*, 947 N.E.2d 1154 (Mass. App. Ct. 2011) (unpublished opinion); *see also Mike Glynn & Co. v. Hy-Brasil Restaurants, Inc.*, 914 N.E.2d 103, 107 (Mass. App. Ct. 2009). To recover under these theories, "a plaintiff must prove that (1) it conferred a measurable benefit upon the defendant; (2) it reasonably

expected compensation from the defendant; and (3) the defendant accepted the benefit with the

knowledge, actual or chargeable, of the plaintiff's reasonable expectation." *Stewart Title Guar. Co. v.*

*Kelly*, 146 N.E.3d 1142, 1151 (Mass. App. Ct. 2020); *see also Mike Glynn*, 914 N.E.2d at 107. "The

fact that a person has benefited from another 'is not of itself sufficient to require the other to make

restitution therefore." *Liss v. Studeny*, 879 N.E.2d 676, 682 (Mass. 2008) (internal quotations

omitted). An award of damages is only warranted when a person's reasonable expectations have

been defeated by "unjust enrichment of one party and unjust detriment to the other party." *Id.* In

this case, there is no evidence that Plaintiffs had knowledge of Magic Lantern or its Facebook page,

let alone that they had a reasonable expectation of compensation from Orange Lantern. Summary

judgment will enter as to Plaintiffs' unjust enrichment and quantum meruit claims (Counts XI and

XII).

4.   Statute of Limitations

Having denied both parties' motions for summary judgment as to Plaintiffs' defamation

claims, the court turns to Defendants' arguments that Orange Lantern is entitled to summary

judgment as to the subset of defamation claims based on images posted to Magic Lantern's

Facebook page more than three years before Plaintiffs filed their original complaint on July 1, 2019.

"[A]n action for defamation must be 'commenced only within three years next after the cause of

action accrues.'" *Harrington v. Costello*, 7 N.E.3d 449, 453 (Mass. 2014) (quoting Mass. Gen. Laws

c. 260, § 4). The statute of limitations for defamation claims generally begins to run on the date the

defamatory statement is published, unless the discovery rule applies. *Id.* at 453-54. Under the

discovery rule, "where a plaintiff has suffered an 'inherently unknowable' wrong," a cause of action

for defamation does not accrue until the plaintiff knows or has sufficient notice that they were

harmed and that the defendant's conduct caused the harm. *Id.* at 454. Plaintiffs contend that

because their images were posted to Magic Lantern's Facebook page, rather than published in a widely-available newspaper, the discovery rule should apply to toll the statute of limitations from the date an image was posted through the date when Plaintiffs learned, or should have learned, about the posting. They made a similar argument to another court in this district and that court certified a question to the SJC regarding how the discovery rule should apply to defamation claims based on social media postings. *Davalos*, 2023 WL 8703557. As application of the discovery rule is a question of state law, this case will be stayed until the SJC provides a response to the certified question.

### III.   CONCLUSION

For the reasons set forth above, Defendants' motions to exclude Plaintiffs' experts (Dkt. Nos. 60 and 61) are DENIED; Plaintiffs' Motion for Summary Judgment (Dkt. No. 62) is DENIED; and Defendants' Motion for Summary Judgment (Dkt. 59) is DENIED as to Plaintiffs' defamation claims (Count VIII) and ALLOWED as to Plaintiffs' Lanham Act claims (Counts I and II), Chapter 93A claims (Count VII), Section 1B and 3A claims (Counts IV and V), negligence claims (Count IX), and equitable, quasi-contract claims (Counts XI and XII). Additionally, because a question has been certified to the SJC regarding how the Massachusetts discovery rule should apply to Plaintiffs' defamation claims based on Facebook postings made more than three years before they filed their original complaint, this case is stayed. Counsel for Plaintiffs shall notify this court, in writing, within ten days after the question certified in *Davalos* is answered or an alternative resolution is reached in *Davalos*.

It is So Ordered.

_/s/ Mark G. Mastroianni_____

MARK G. MASTROIANNI

United States District Judge